

**SO ORDERED.**

**SIGNED this 18th day of May, 2012.**



Robert E. Nugent
United States Chief Bankruptcy Judge

_____

OPINION DESIGNATED FOR ON-LINE PUBLICATION
BUT NOT PRINT PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

IN RE:
)
JOHN T. PRATT, ) Case No. 10-13765
DOROTHY R. PRATT, ) Chapter 13
)
        Debtors. )
_____)

### ORDER OVERRULING DEBTORS' OBJECTION TO CLAIM OF TIMBERCREEK COMMUNITY HOMEOWNERS ASSOCIATION

      Timbercreek Community Homeowners Association (HOA) filed a proof of claim in this case for the many years of unpaid homeowners' dues and special assessments owed by the debtors John and Dorothy Pratt. The Pratts objected to the HOA's claim.[1] A creditor's claim is presumed valid; only if the party objecting to it meets the presumption of validity does the burden of proof shift to

---

[1] Dkt. 43.

-1-

the claimant.[2] The debtors' objections are three: first, they claim that the HOA has not provided maintenance and repair services in an amount commensurate with the dues being charged; second, that the HOA should credit the Pratts' claim for the amount that the Pratts' insurer paid to replace roofs that were destroyed in a hailstorm; and third, that the net proceeds of the sale of any four-plex should only be applied to the dues that are owing on that unit. After trial and consideration of the evidence and the parties' briefs, I conclude that the debtors failed to meet the presumption of validity concerning the dues and that the HOA's amended claim is enforceable. The Pratts did meet the presumption concerning the roof expense credit, but failed to demonstrate that they are entitled to a larger credit than that already allowed by the HOA in the amended claim. Finally, I agree with the debtors that the sale proceeds of the units sold during the case should be applied only to the dues owed on that unit with any surplus being retained by the trustee for distribution under the plan.[3]

*Facts*

When they filed this case, the Pratts owned eight town homes in two fourplexes in the 74-unit residential Timbercreek Community, located in Lee's Summit, Missouri. They originally purchased 12 units (3 fourplexes) new in 1989. They sold one fourplex before filing and another fourplex has been sold pursuant to § 363(f) during the case. The Pratts are older and retired. They reside in Wichita, but their son lives in one of the units. They rent out the other seven.[4]

---

[2] § 502(a) and (b)(1); Fed. R. Bankr. P. 3001(f); *In re Harrison,* 987 F.2d 677 (10th Cir. 1993); *In re Broadband Wireless Intern. Corp.,* 295 B.R. 140 (10th Cir. BAP 2003).

[3] The Court has jurisdiction over this core, contested matter under 28 U.S.C. § 1334 and § 157(b)(2)(B). Debtors appear by their attorney Mark J. Lazzo. Timbercreek Community Home Owners Association, Inc. appears by its attorney Rod Hoffman of Slagle, Bernard & Gorman, P.C.

[4] According to HOA's counsel, the properties are town homes, not condominiums.

Timbercreek is governed by three organic documents that run with the land and allocate various management and operational responsibilities among the unit owners and the HOA. These are the Declaration, the Covenants and Restrictions, and the Bylaws.[5] It is the duty of the HOA to repair, restore and replace elements of the townhomes as necessary. This work is funded by assessments that the HOA may levy on the homeowners.

*Duties of the Association*: *Maintenance*

Article V of the Declaration outlines the duties of the HOA.[6] Section 5.1 imposes a duty of maintenance of the Common Areas and Structures and the laying and collecting of assessments to accomplish that.[7] The word "Structures" is defined in Article I of the Covenants as: "all buildings located on the Property, including however only the external and structural or load-bearing portions of such buildings and not including the internal portions thereof which constitute the livings [sic] areas of the Units."[8] The HOA is responsible for roof replacement and can impose special assessments to fund that work.[9]

*Dues and Assessments*

Article VI of the Declaration authorizes regular and special assessments in accordance with

---

[5] Ex. 1, 3, and 2.

[6] Ex. 1.

[7] Ex. 1, § 5.1. Maintenance includes the duty to repair, restore, and replace as necessary. The Covenants also obligate the HOA "for major maintenance and repair of the Structures." Ex. 3, § 4.1 and § 4.2(l). *See also,* Ex. 2, § 4.17(c), (e), and (f) (similar Bylaws provisions).

[8] Ex. 3, § 1.1(p). It does not include the improvements on the common areas. *See* § 1.1(j) defining Facilities.

[9] *See* Ex. 3, § 4.1(b) and § 4.2(c), (f), and (l).

-3-

sections 6.5 of the Declaration of Covenants and Restrictions (Covenants).[10] The regular assessments (also referred to as "dues" in this Order) fund the ongoing operations of the HOA and Common Expenses.[11] Article VI of the Covenants provides that the HOA may levy these assessments and that unpaid assessments become liens on the units.[12] A special assessment may be approved by a simple majority of voting unit owners without regard to the presence of a quorum.[13] The lien that secures an unpaid assessment is subordinate to any pre-existing lien for real estate taxes or mortgages that encumber the unit.[14] The HOA may foreclose its lien on a non-paying unit, or it can sue the unit's owner for a money judgment without waiving or foreclosing its lien.[15]

*Insuring the Structures*

In many town home communities, the Association contracts for insurance that covers loss to the external portions of each structure and the premiums for that insurance are borne ratably by the unit owners. Article VII of the Timbercreek Declaration requires the HOA to maintain casualty insurance on the Structures.[16] Section 7.2(c) makes the premiums for that insurance a common expense to be allocated among the unit owners at the Board's discretion and billed in addition to the assessments. In the event of an insured loss, the benefits are payable to the HOA, the unit owners,

---

[10] Ex. 1, § 6.1 and § 6.2. *See also,* Bylaws, Ex. 2, § 8.7(a), authorizing special assessments for maintenance, repair, restoration of Structures.

[11] *See* Ex. 3, § 1.1(f), defining "Common Expenses."

[12] Ex. 3, § 6.5 and § 6.10.

[13] Ex. 3, § 6.5.

[14] *See also,* Ex. 2, § 8.3

[15] Ex. 3, Covenants, § 6.10(c) and (d).

[16] Ex. 1, § 7.2(b). This coverage is for "full replacement costs."

-4-

and any lienholders on the units.[17] If the cost of repairing an insured loss exceeds the benefits paid, the unit owner is responsible for paying the balance of the repair cost.[18]

In June of 2007, the members of the HOA voted not to place the common casualty insurance that the Declaration requires. The HOA's board filed a notice in the Jackson County Recorder's Office stating that the HOA would cease providing the casualty insurance on the Structures and that unit owners should secure coverage on their own units from insurers of their choosing at their expense.[19] The Board reminded the unit owners that the regular monthly homeowners dues do not include the cost of casualty insurance.[20] Because the Pratts' mortgage lender required them to maintain casualty insurance as a condition of their mortgage, the Pratts already maintained separate insurance.

*The Roof Assessment*

At the February 20, 2008 annual meeting, the HOA approved a special assessment of $2,625 per unit to replace the roofs and billed that assessment on April 30, 2008.[21] The HOA had negotiated

---

[17] Ex. 1, § 7.2(e).

[18] Ex. 1, § 7.2(f).

[19] Ex. E. According to Ms. Doris, the HOA actually dropped the casualty insurance in 2002 as a result of the September 2001 terrorist attacks because following the attacks the casualty insurance premiums skyrocketed. The unit owners declined to approve an assessment for the increased insurance premiums and at that point, decided to purchase their own casualty insurance.

[20] The HOA continued to provide public liability insurance for the common areas and assess the unit owners for that premium. *See* Ex. 1, § 7.1.

[21] Ex. K and J. The total special assessment approved and billed included not only the roof assessment, but also included a $1,250 assessment for painting and a $375 assessment for concrete repairs, for a total special assessment of $4,250 per unit. This calculates as a total special assessment of $34,000 for the Pratts' 8 units and the roof assessment of $2,625 per unit computes to an assessment of $10,500 for each four-plex. Shelly Doris testified that the HOA

with a roofer to replace each unit roof for a discounted amount and, had the Pratts paid the assessment, they would have received new roofs. According to a meeting notice, owners who had already "individually paid for these repairs will have their remaining credit deducted from the special assessment amount."[22] Payment of the special assessment was due within one year. Because the Pratts never paid the April 2008 special assessments, they did not receive new roofs.

*The HOA's Claim and the Pratts' Objections*

The Pratts quit paying regular dues sometime in 2006. They did not pay the 2008 special assessment for roofs. In the fall of 2009, the HOA sued them to collect the dues and assessments, but that action was stayed when they filed their chapter 13 case on November 4, 2010. As of the petition date, according to the HOA's proof of claim, the Pratts had a past due balance of $66,410.54 including all of their unpaid regular monthly assessments and the $4,250 special assessment billed in April of 2008.[23] As will be more thoroughly discussed below, the HOA reduced its claim by an amount equal to the special roof assessment, $21,000 ($2,625 X 8 units) after the Pratts replaced their roofs with insurance proceeds following a 2011 hail storm.[24] The amended claim amount of $45,410.54 also includes attorneys fees and expenses incurred by the HOA in attempting to collect

---

had negotiated a volume discount with a roofing contractor for replacement of a four-plex roof for $12,000 but had bids as low as $10,500. But because the Pratts had not paid the special assessment at the time of the hail storm, they could not get their roof replaced through the HOA. Had the Pratts paid the special assessment, the HOA would have had the Pratt roofs replaced within 30 days by their roofing contractor.

[22] Ex. K.

[23] *See* Ex. 4.

[24] *See* Ex. 4 and 5 (Proof of Claim No. 1 as amended). Timbercreek's original claim in the amount of $66,410.54 was timely filed November 5, 2010. It was later amended to $45,410.54 on September 29, 2011 to give the Pratts a $21,000 credit for replacing the roofs of their units after a storm.

the Pratts' dues and assessments.

In April, 2011, a severe hail storm in Lee's Summit totally destroyed the Pratts' units' roofs. Before they replaced the roofs, they sought the HOA's approval. Acting through its agent, Community Association Management (CAM), the HOA approved the proposed installation in the following e-mail message from CAM's Shelley Doris to Mr. Pratt:

> The legal council [sic] for Timbercreek was consulted as the approval of this item alters the physical structure[25] and the balance on accounts . . .
>
> 1. Credit can be applied to the aged balance for the amount originally assessed for roof work on each unit. *No additional credit will be given if actual cost is more than original assessment.* . . .
>
> Homeowner must reply with final receipt/proof of installation and payment rendered to vendor in order to trigger the credit to account.[26]

The Pratts went ahead with the repairs and received the $21,000 credit, considerably less than the $44,085 their insurer paid for the new roofs.[27]

The Pratts also replaced the garage doors on one of the fourplexes (100-106 Greystone) in

---

[25] The Pratts replaced the roofs with composition shingles; the four-plexes previously were roofed with wood shakes. This modification would have required the consent of the Architectural Control Committee of the HOA. *See* Covenants, Ex. 3, § 5.1(l) and § 7.2.

[26] Ex. O [emphasis added].

[27] Ex. 6-9. As the insurance adjuster's claim summary reflects, the Pratts submitted a claim for damage for more than their roofs; it included guttering and downspouts, and replacement of window and door screens and glass. *See* Ex. 7 and 9. The roofing contractor's invoice on one four-plex was $22,174 and covered by insurance proceeds but the contractor's invoice on the other four-plex was $22,091 of which the insurer paid $21,911. But the roofing contractor's invoice also reflected work other than the roof (including siding, HVAC, gutters, and unspecified "miscellaneous") and the invoices were not itemized and the cost was not allocated among the work described. *See* Ex. 6 and 8. The Pratts paid out-of-pocket the amount of the invoice in excess of the insurance proceeds, some $180 on the one four-plex, plus a $2,500 deductible on each four-plex.

late August of 2011. That cost the Pratts $1,114 in materials and $675 for installation.[28] The $675 installation cost was paid from the sale proceeds when this fourplex was sold but the materials were not.[29] The Pratts seek to offset the HOA's claim by these unpaid garage door costs because they contend that these repairs were the obligation of the HOA.

During the pendency of this case, the Pratts sold the fourplex at 100-106 Greystone and, after paying the mortgage lienholder and back property taxes, the trustee holds $47,933 in proceeds, some of which should be applied to pay the past-due assessments and dues for those four units.[30] The Pratts argue that these funds should only be applied to any amounts that remain past-due and unpaid on these four units with any surplus being reserved for distribution under the confirmed plan.

In summary, the Pratts object that (1) they have not received value commensurate with the amount of dues the HOA claims; (2) they should be reimbursed in full for the cost of the roofs they or their insurer replaced; and (3) that the surplus funds held by the Trustee should be disbursed only to those dues found to be owed the HOA for the 100-106 Greystone duplex and the surplus should be distributed to their unsecured creditors.

*Analysis*

A.      <u>Procedure and Proof on Claims Objections</u>

The Bankruptcy Code provides that the claim of a creditor is presumed to be valid unless a party in interest objects to it.[31] The bankruptcy court may not allow any part of a claim that is

---

[28] Ex. 17 and 18.

[29] Ex. 12.

[30] *See* Ex. 12 and 13; Dkt. 44, 52. The sale of the fourplex by private treaty was approved in the amount of $240,000.

[31] § 502(a).

-8-

unenforceable as a matter of applicable nonbankruptcy law.[32] When a party objects to the allowance of a claim, that party had the burden of meeting the presumption of validity by producing competent evidence to demonstrate that an actual dispute regarding the claim's validity or amount exists.[33] The first step, then, is to determine whether the debtors have presented enough proof to meet the presumed validity of the HOA's claim. Doing so requires examining the organic documents and determining what law governs their interpretation.

     B.     <u>Choice of Law: Missouri Law Applies</u>

I interpret the provisions of the Declaration and the Covenants like any other contract and the familiar rules of contract interpretation apply.[34] The terms, conditions and restrictions of the Declaration run with the land. When the Pratts acquired their four-plexes in 1989, they became bound by the terms of these instruments.[35] Neither the Declaration nor the Covenants contains a choice of law provision. The Tenth Circuit has held that a federal court sitting in diversity and

---

[32] § 502(b)(1).

[33] Fed. R. Bankr.P. 3001(f); 11 U.S.C. § 502(a) and (b)(1). *See In re Broadband Wireless Intern. Corp.,* 295 B.R. 140, 144 (10th Cir. BAP 2003).

[34] *Wildflower Community Ass'n, Inc. v. Rinderknecht,* 25 S.W. 3d 530, 534 (Mo. App. 2000); *DeBaliviere Place Ass'n v. Veal,* 337 S.W. 3d 670, 676-77 (Mo. S.Ct. 2011); *Kauffman v. Roling,* 851 S.W. 2d 789 (Mo. App. 1993); *Falkner v. Colony Woods Ass'n,* 40 Kan. App. 2d 349, 353, 198 P.3d 152 (2008); *North Country Villas Homeowners Ass'n v. Kokenge,* 38 Kan. App. 2d 254, 260, 163 P.3d 1247 (2007).

[35] Ex. 1, opening paragraph. *See also,* Ex. 3, § 3.1 (a unit owner's acceptance of a deed to his unit "shall be deemed to have contractually agreed to be bound by all terms and provisions of both Declarations [the Declaration and Covenants]." See *Maryland Estates Homeowners' Ass'n v. Puckett,* 936 S.W. 2d 218 (Mo.App. 1996) (restrictions were a contract to which each homeowner in subdivision became a party when acquiring property in the subdivision; by acquiring property, owners agreed to terms of restrictive covenants).

-9-

Case 10-13765    Doc# 111    Filed 05/18/12    Page 9 of 20

adjudicating state law claims must apply the forum state's choice of law principles.[36] Bankruptcy courts have also applied their forum state's choice of law principles when considering a debtor's objection to proof of claim.[37] While the Tenth Circuit has not spoken on whether bankruptcy courts should apply federal or state choice of law rules, I conclude that as the issues in this matter revolve around state law, Kansas' choice of law rules should determine the applicable state law governing the HOA's claim.[38]

Kansas' choice of law rules for contracts generally provide that the interpretation and

---

[36] *Dang v. UNUM Life Ins. Co. of America,* 175 F.3d 1186, 1190 (10th Cir. 1999), citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487 (1941).

[37] *See In re Rottiers,* 449 B.R. 133 (Bankr. D. N.M. 2011) (observing that a bankruptcy court's jurisdiction is not based upon diversity but applying state law of forum, New Mexico's choice of law rules). Other courts have noted that a bankruptcy court's jurisdiction is not based upon diversity, but federal bankruptcy law, and therefore apply federal common law choice of law rules and follow the Restatement (Second) of Conflict of Laws, s*ee In re Miller,* 292 B.R. 409, 413 (9th Cir. BAP 2003) (citing *In re Vortex Fishing Sys., Inc.,* 277 F.3d 1057, 1069 (9th Cir. 2002). A third set of courts have held that a bankruptcy court need not apply federal common law choice of law rules where there is no significant federal bankruptcy policy to enforce, and may apply the forum state's choice of law rules. *See In re Gaston,* 243 F.3d 599, 606-07 (2d Cir. 2001) (concluding that breach of contract claim asserted in bankruptcy did not implicate significant federal policy to justify applying federal choice of law rules); *In re Merritt Dredging Co.,* 839 F.2d 203, 205-06 (4th Cir. 1988) (applying *Klaxon* choice of law rules of the forum state where bankruptcy court is determining the extent of a debtor's property interest which is defined by state law under *Butner*).

[38] As a practical matter, it may not matter whether Kansas or federal choice of law rules apply to determine which state's law applies to the HOA's claim as the outcome of those choice of law rules likely yield the same result. The federal choice of law rules governing contract matters provides that the state with the most significant relationship to the transaction and the parties is the state substantive law that should govern the contract. *See* Restatement (Second) of Conflicts of Laws, § 188 (1971). On the surface, it is not apparent that the legal principles governing the interpretation and construction of contracts differ widely between Kansas and Missouri law.

-10-

construction of a contract is governed by the law of the state where the contract was made.[39] A contract is "made" where the last act necessary for its formation occurs.[40] The Timbercreek residential community is located in Lee's Summit, Missouri. Its developer, Todd George Investors, was a Missouri general partnership, but executed the Declaration and Covenants in Johnson County, Kansas in June of 1989. Those documents were then recorded with the Jackson County, Missouri Recorder in October of 1989. As a matter of Missouri law, the owner of the property to be governed by a declaration and covenants must record them for them to be valid.[41] When the Pratts took title to the fourplexes, they became contractually obligated to abide by the Declaration and Covenants. Missouri law applies to this dispute.

The interpretation and legal effect of the Declaration and Covenants should be made according to the intent and purpose of the instruments after examining the entire document. If the written instruments are clear, the intent of the parties is determined from the language of the contract, without applying rules of construction.[42] The written instruments are not ambiguous unless two or more meanings could be construed from their terms. With these rules in mind, we move to the three elements of the debtors' claim objection.

    C.        Merits of the Objections

---

[39] *Dragon v. Vanguard Industries, Inc.,* 277 Kan. 776, 89 P.3d 908 (2004) (Kansas follows the *lex loci contractus* rule); Restatement (First) of Conflict of Laws, § 332 (1934).

[40] *Layne Christensen Co. v. Zurich Canada,* 30 Kan. App. 2d 128, 38 P.3d 757 (2002).

[41] *See* V.A.M.S. § 448.020. Kansas has a similar statute, K.S.A. 58-3115(a).

[42] *See Mullin v. Silvercreek Condominium Owner's Ass'n,* 195 S.W. 3d 484, 490 (Mo. App. 2006); *Clampit v. Cambridge Phase II Corp.,* 884 S.W. 2d 340, 345 (Mo. App. 1994); *Wildflower Community Ass'n, Inc. V. Rinderknecht,* 25 S.W. 3d 530, 534 (Mo. App. 2000); *Hills v. Greenfield Village Homes Ass'n, Inc.,* 956 S.W. 2d 344 (Mo. App. 1997).

1. The HOA is Entitled to Collect Unpaid Dues and Assessments.

The Pratts claim that the HOA did not provide repair and maintenance services of a value commensurate to the dues it charged. Specifically, they pled that:

> Timbercreek has not complied with its obligations to maintain the exterior structures of the 4-Plexes. Timbercreek is not due the amounts it claims. Timbercreek has not incurred expenses close to the $66,410 it claims is owed for work done or to be done on the 4-Plexes.[43]

They have failed to meet the HOA's presumption of validity in several ways. First, there is no evidence that would support an assertion that exterior structural maintenance has somehow been ignored. As noted above, the HOA has the duty to maintain the Structures. Nothing presented by the debtors remotely suggests that structural maintenance or repairs have been ignored. Similarly, the allegation that "Timbercreek has not incurred expenses close to the $66,410 it claims" has no record support. The Pratts offered no evidence of the value of the services provided by the HOA. More importantly, the regular assessments that the Covenants authorize are affirmative obligations of the unit owners that are in no way tied to the actual expenses of the HOA.

Finally, the Pratts' assertion that the HOA neglected its duty to maintain the Structures is disingenuous at best. Three years before the 2011 storm, after giving notice of the unit owners' vote and approval, the HOA levied a special assessment for roof replacement, painting, and concrete work, on all unit owners to carry out its duty to maintain, repair or replace the Structures as it was authorized to do by §§ 4.2(l) and 6.5 of the Covenants. The Pratts refused to pay these assessments. Their failure to pay can in no way be construed as neglect or breach of duty on the part of the HOA.

Part of the Pratts' objection relates to the garage doors that the HOA did not replace. Neither

---

[43] Dkt. 43, ¶ 5.

-12-

the Declaration nor the Covenants refer to "garage doors," but the Covenants clearly place repair liability for "doors" on the unit owner under § 4.1(a).[44] That section allocates duties of maintenance and repair between the HOA and individual owners and specifies that the unit owner shall have the obligation to "repair and maintain that portion of the Structure in which the Unit Owner's Unit is housed . . . if the same does not involve the structural integrity of the Structure." Among the enumerated repairs that fall to the unit owner are the "repair and maintenance of screens, doors and locks." Garage doors are "doors" and are not part of the Structure; they are not "load-bearing" external portions of the building.[45] The Pratts can not claim an offset to the amended proof of claim for the cost of replacing their garage doors, nor can they rely on this expense in support of their objection that the HOA has somehow breached its duties to them under the Covenants.

In short, except as to their objections concerning the insurance and the roof reimbursement, the Pratts did not meet the presumption of validity of the claim as amended. The HOA assessed the dues and the Pratts simply did not pay them. Indeed, the Pratts stopped paying dues in 2006, long before any issues surrounding roofs, garage doors, or their other complaints arose. The Pratts, not the HOA, breached their obligations under the Covenants. This part of their objection should be overruled.

> 2. The HOA's Discontinuation of the Common Casualty Insurance was not an Actionable Breach that Justified the Pratts' Breach.

The Pratts met the presumption of validity as to the discontinuation of the common insurance coverage and the requested roof reimbursement, and shifted the burden of proof on those claims to

---

[44] Ex. 3.

[45] Ex. 3, § 1.1(p).

-13-

the HOA. The HOA met its burden of proof concerning the amount and basis of its claim while the Pratts failed to demonstrate the validity of their defenses or that they were damaged in any way by the Board's discontinuing the insurance. Accordingly, the amended claim should be allowed as filed.

The Pratts complaint that the HOA breached its obligation to provide casualty insurance has some validity. Like the Pratts' duty to pay dues, the HOA's duty to provide insurance is an affirmative covenant that imposes a duty on a party to perform an affirmative act.[46] But that duty was not without conditions, one of which was that the HOA could recover the premiums from the unit owners. If the HOA's declining to provide the insurance was a breach, so were the Pratts' numerous previous failures to perform. In no way does this purported breach invalidate the HOA's claim for unpaid dues and assessments that arose beforehand. The Pratts produced no evidence that the HOA's claim included any charges or assessments for casualty insurance after it ceased carrying the same. In fact, the Declaration provides that premiums for this insurance were to be ratably divided among the units and billed to their owners in addition to the regular monthly dues.[47] Then in 2008, when the unit owners refused to approve the casualty insurance premium, the HOA was precluded by the Declaration from funding that expense. It opted to drop the casualty insurance, leaving each unit's owner to place its own insurance at its own expense. The only budgeted "insurance" expense for the 2008 budget and funded by the monthly dues was the common areas public liability insurance. Section§ 7.1(c) of the Declaration makes the premiums for common areas insurance part of the Common Expenses that are paid from regular assessments and different in character from the

---

[46] *Hills v. Greenfield Village Homes Ass'n, Inc.*, 956 S.W.2d 344 (Mo. App. 1997)

[47] Ex. 1, § 7.2 ("Such bills shall be in addition to, and shall not be a part of Assessments levied against Unit Owners. . . .).

-14-

premiums for the casualty coverage.

The Pratts failed in their burden to go forward in support of their defenses. They were not damaged by the lack of common casualty insurance. When the owners did not approve the premium assessment in 2008, they implicitly undertook to insure the structures themselves on an individual basis. The HOA gave notice of this change and filed it of record, giving notice to prospective owners and members of the HOA that they needed to maintain separate casualty insurance on their individual units.[48] The Pratts were already required by their lender to carry their own individual casualty insurance on their units and had apparently done so before; the lack of common casualty insurance did not damage them because they already maintained insurance.[49] Nor did the unilateral change in the way the HOA handled the insurance materially change the positions of the parties. Before 2008, the Pratts and their neighbors were liable for their ratable share of the casualty policy premiums as denoted in § 7.2. During and after 2008, the Pratts were required to pay their own premiums. And, whether the HOA paid the insurer or the Pratts did, they were liable for any shortfall after applying the insurance proceeds to their losses.[50] In either case, the Pratts and the other unit owners were ultimately responsible for damage to their units. If the HOA was in breach, the

---

[48] Ex. E. The notice made clear that the monthly homeowners' dues did not include the cost of casualty insurance on the structures.

[49] *Kansas State Bank v. Overseas Motosport, Inc.,* 222 Kan. 26, 563 P.2d 414 (1977) (Recovery may not be had where damages or loss are not the proximate result of the breach of contract); *Guidry v. Charter Communications, Inc.,* 269 S.W. 3d 520 (Mo. App. 2008) (essential element of breach of contract action requires that plaintiff suffered damages and those damages must be proximately caused by the breach or reasonably contemplated by the parties); *Kforce, Inc. v. Surrex Solutions Corp.,* 436 F.3d 981 (8th Cir. 2006) (Under Missouri law, party injured by breach of contract can recover damages that are the direct and natural consequences of the breach or were within the contemplation of the contracting parties).

[50] *See* Ex. 1, § 7.2(f).

-15-

Pratts did not show that they were damaged by it.

At trial, for the first time, the Pratts alleged that the HOA had also breached the Declaration by hiring CAM to manage the Timbercreek Community, claiming that the HOA is prohibited from entering into a "professional management contract" and that CAM is a professional manager.[51] But as with the casualty insurance breach, the Pratts have not demonstrated that they have been damaged by this alleged breach or to what extent, even if the Court were to conclude that retention of CAM's administrative services violated § 10.5. The Pratts were already past due on their assessments by the time CAM entered the picture in 2009. Nor did the Pratts make any showing of the amount of their monthly dues that were attributable to CAM management fees. And, as Ms. Doris testified, CAM provides various services to the HOA, but is not its sole managing agent. This "defense" should be disregarded.

The Pratts' argument about the sufficiency of their roof reimbursement is similarly without weight. They contend that they are entitled to an offset against the HOA's claim for the cost they incurred in replacing their roofs and guttering after the 2011 hail storm. By amending its claim, the HOA has already credited the Pratts $21,000, essentially giving them credit for having paid the special roof assessment ($2,625 x 8 units) that was levied in 2008, leaving a balance due of $45,410.[52]

The Pratts argue that they are owed another $20,000 because the roofs cost more than $40,000 to replace using composition shingles instead of the original wood shakes. To allow this credit would be to allow the Pratts far more than they were entitled to under the Declaration and

---

[51] *See* Ex. 1, § 10.5.

[52] Ex. 5.

-16-

Covenants. As § 7.2(f) of the Declaration provides, if the HOA-provided casualty insurance was not sufficient to pay the entire cost of remedying a loss, "the deficiency shall be paid by the Unit Owner." Whether the HOA or the Pratts insured the roofs, the Pratts were responsible for any replacement cost that exceeded the insurance proceeds or the special assessment.[53] Under the express terms of the Declaration, the Pratts remain liable for any costs in excess of their insurance coverage and the roof assessment for which they have already received credit.

In short, the Pratts still owe the HOA many years of unpaid monthly homeowner's dues and special assessments because they haven't paid them since 2006 while continuing to receive the management services the HOA provides. They did not sustain their burden to prove these defenses and offsets to those claims and, accordingly, the HOA's amended proof of claim should be allowed in the amount of $45,410.54.[54]

> 3. Timbercreek Retains a Lien in the Sale Proceeds of 100-106 Greystone in the Amount of $22,764.06 plus Attorneys Fees.

When the debtors completed the § 363(f) sale of 100-106 Greystone free and clear of liens, the lien of the unpaid homeowners' assessments attached to its proceeds in the hands of the debtor.[55] Under the order approving that sale, the Trustee was to hold the net proceeds after payment of sale costs, ad valorem taxes and the real estate mortgage pending further court order. Unpaid dues are

---

[53] Ex. 1, § 7.2(f) makes the unit owner responsible for a deficiency in the case of an insured loss.

[54] I note that this amount is equal to more than 50% of the community's budgeted revenue for 2008. See Ex. I. This is a significant financial burden on a small town home community.

[55] See §§ 363(f) and 1303 (trustee's powers under § 363(f) delegated to chapter 13 debtor).

-17-

liens on the units to which they apply, but not upon any other units.[56] Thus the HOA's lien on the proceeds of 100-106 Greystone is limited to the amount of unpaid dues, fees, expenses, and interest that is attributable to those four units, or $33,264.06.[57] This amount should be reduced by the roof credit of $2,625 per unit, or $10,500, for a remaining lien of $22,764.06 plus any attorneys fees or other collection expenses that the HOA incurred after the petition date. The balance of the proceeds of 100-106 Greystone remaining after payment of that part of the claim should be retained by the Trustee and distributed as contemplated by the plan.

    D.    <u>HOA's § 506(b) Claim for Attorneys Fees and Expenses</u>

By separate pleading, the HOA seeks to be reimbursed its attorney's fees and expenses incurred in enforcing its claim and defending this objection. It seeks $5,940 in attorney's fees and expenses for the period running from the date of the bankruptcy petition through the post-trial preparation of its brief, plus $250 for preparation of the application itself, for a total of $6,190.[58]

Section 506(b) authorizes an oversecured creditor to recover any interest or reasonable fees and charges that the creditor incurs in pursuing the claim to the extent they are authorized either by the underlying agreement or state law. The Covenants authorize the recovery of attorney's fees and expenses. Section 6.10 is titled "Lien for Assessments."[59] Subsection (a) provides that unpaid assessments, "including penalties, interest which may be imposed by the Board or the Association [sic] costs and reasonable attorneys' fees, shall constitute a lien" upon the unit owner's unit.

---

[56] Ex. 3, Covenants, § 6.10 (All Assessments imposed but unpaid by a Unit Owner . . . including attorneys fees . . . shall constitute a lien *on such unit* . . . .).

[57] See Claim no. 1-2, part 2.

[58] Dkt 91.

[59] Ex. 3.

-18-

Subsection (c) provides for enforcement of the assessment lien by foreclosure of the lien in which case "the Unit Owner shall be required to pay all of the costs and expenses of such foreclosure proceeding, the costs and expenses for filing the notice or claim of lien, and all reasonable attorney's fees and expenses incurred by the Association." Subsection (d) provides that, "in addition to the above [remedies]," the HOA may seek a money judgment for unpaid assessments against the unit owner without foreclosing the assessment lien. Because this relief is cumulative to the collection and foreclosure remedies referenced in subsections (a) and (c), I conclude that attorneys' fees are an element of the recovery in such a suit.

In addition, the § 363(f) sale of the units free and clear of liens is akin to a foreclosure; the lien is transferred from the real estate and attaches instead to its proceeds in the hands of the debtor under § 1303. Subsection (c)'s provision for attorneys fees incurred in a foreclosure applies here as well.

Having independently reviewed the itemization of fees and expenses, I find them to be reasonable both as to time expended and the amounts charged. However, the HOA's recapitulation of legal services reflects that the first statement dated January 10, 2011 is in the amount of $336.50 but the statement attached in Exhibit A is in the amount of $254.00, reflecting a deduction for a previous balance of $82.50. Accordingly, the HOA's application for attorney's fees and expenses in the amount of $6,107.50 ($6,190.00 - $82.50) is approved. There is no record of a formal offer of judgment and the HOA has been allowed its amended claim as filed. Therefore, there is no legal basis upon which to reduce these reasonable fees. The HOA may seek reimbursement of one-half of the fees from the net sale proceeds of 100-106 Greystone in addition to the unpaid dues and assessments on those four units. The remaining balance of the HOA's attorneys fee award will be

added to the HOA's remaining allowed claim that is secured by its lien on the unsold four units at 108-114 Greystone.

*Conclusion and Order*

The Pratts' objections to Timbercreek Community Homeowner Association's claim no. 1-3 are OVERRULED and thes claim is ALLOWED in the amount of $ 45,410.54.[60] In addition, the HOA's motion for attorneys fees and expenses is ALLOWED in the amount of $6,107.50, the same to be allocated equally between the two four-plexes as set forth above. That portion of the HOA's claim attributable to 100-106 Greystone, including attorneys fees and expenses, $25,817.81 shall be paid by the Trustee with the net proceeds of sale. The remaining proceeds, $22,115.19, shall be retained by the Trustee and distributed in accordance with the Pratts' plan. The remaining balance of the HOA's allowed claim for unpaid dues and assessments, including attorneys fees and expenses and equaling $25,700.23, plus any future unpaid assessments, attorneys fees, or expenses relative to 108-114 Greystone shall be secured by the lien of the assessment on those units.

# # #

---

[60] The supporting statements attached to the HOA's proof of claim reflect that the total claim should be allocated $33,264.06 to the 100-106 Greystone four-plex and $33,146.48 to the 108-114 Greystone four-plex. Each of those amounts must be reduced by $10,500 for the roof assessment credit to arrive at the total amended and allowed claim of $45,410.54.

-20-

Case 10-13765    Doc# 111    Filed 05/18/12    Page 20 of 20